## HEALTH

### LIFE-SUSTAINING PROCEDURES – APPLICATION OF HEALTH CARE DECISIONS ACT TO "DO NO RESUSCITATE" ORDERS

May 3, 1994

*The Honorable Rosalie S. Abrams*
*Director, Office on Aging*

You have requested our opinion on a number of issues related to the interpretation of the Health Care Decisions Act, particularly as it affects decisions concerning "do not resuscitate" orders. Your specific questions, and our responses, are as follows:

1. Under what circumstances, if any, may a "surrogate decision maker"[1] consent to the withholding or withdrawing of a life-sustaining procedure or the entry of a "do not resuscitate" ("DNR") order on a chart of a patient? Must the patient be certified to be in a terminal condition, persistent vegetative state, or end-stage condition before a life-sustaining procedure may be withheld or withdrawn or before the entry of a DNR order can be authorized by the surrogate?

In general, when the issue presented to a surrogate is whether to authorize or decline a life-sustaining procedure that, if authorized, would be performed at a predictable time in the very near future should the patient's condition continue along its present course (for example, kidney dialysis), the surrogate may decline the life-sustaining procedure on behalf of the patient only if the patient has been certified to be in a terminal condition, persistent vegetative state, or end-stage condition. Although cardiopulmonary resuscitation ("CPR") is a "life-sustaining procedure" within the meaning of the Health Care Decisions Act, the issue posed by a DNR order is somewhat different, for such an order speaks to a form of treatment, CPR, that would be applied, if at all, only after an unpredictable and dramatic change in the patient's condition – that

---

[1] The term "surrogate decision maker" is used in the Health Care Decisions Act. For brevity's sake, we shall refer to a "surrogate" in this opinion.

is, if the patient were to suffer a cardiac arrest. A surrogate may approve the entry of a DNR order on behalf of patient who has not been certified to be in a terminal condition, persistent vegetative state, or end-stage condition if, but only if, two physicians concur that the event of cardiac arrest itself would signify that, at that future time, the patient would be in a terminal or end-stage condition.

2.      Under what circumstances, if any, may a guardian consent to the withholding or withdrawing of a life-sustaining procedure or the entry of a DNR order on the chart of a patient? Must the patient be certified to be in a terminal condition, persistent vegetative state, or end-stage condition before a life-sustaining procedure may be withheld or withdrawn or before the entry of a DNR order can be authorized by a guardian?

A guardian of the person of a patient may consent to the withholding or withdrawing of a life-sustaining procedure, including entry of a DNR order if, but only if, (i) the court has approved the decision to forgo the life-sustaining procedure, including entry of a DNR order, whether or not the patient has been certified to be in a terminal condition, persistent vegetative state, or end-stage condition; or (ii) under circumstances specified by law, the court has authorized the guardian in advance to make decisions concerning life-sustaining procedures *and* the patient has been certified to be in a terminal condition, persistent vegetative state, or end-stage condition.

3.      What is the responsibility of the guardian when the patient's attending physician indicates that a life-sustaining procedure should be withheld or withdrawn or that a DNR order should be entered because such procedure, or any effort to resuscitate the patient, would be medically ineffective? What type of documentation is necessary under these circumstances by the physician, by the guardian, or by the court?

A guardian should report to the court that the patient's attending physician has determined that CPR or another life-sustaining procedure is medically ineffective. This determination by the attending physician must be certified in writing, with the concurrence of a second physician, and the guardian should supply the court with a copy of the written certification.

4.    Does a health care agent have authority to instruct that a life-sustaining procedure be withheld or withdrawn from, or that a DNR order be entered for, a patient who has not been certified to be in a terminal condition, persistent vegetative state, or end-stage condition?

If the grant of authority to the agent encompasses decision-making as to life-sustaining procedures without limitations linked to the patient's condition, a health care agent may instruct that a life-sustaining procedure be withheld on withdrawn from, or that a DNR order be entered for, a patient without a physicians' certification of the patient's condition. If the agent's instruction is inconsistent with generally accepted standards of patient care, the health care provider must bring the matter to the attention of a facility's patient care advisory committee or a court.

5.    What is the effect of a patient's advance directive on the physician's, surrogate's, or guardian's ability to authorize the withholding or withdrawing of a life-sustaining procedure or the entry of a DNR order?

The primary standard for decision-making by surrogates and guardians, and health care agents as well, is to make the decision about life-sustaining procedures that the patient would have wanted to be made under the circumstances. If an advance directive affords guidance about the patient's wishes, the advance directive must be followed. However, a physician has authority independent of any advance directive to determine that a particular life-sustaining procedure, including CPR, would be medically ineffective.

6.    What is the status of DNR orders currently in the medical files of patients in related institutions who have not been certified to be in a terminal condition, persistent vegetative state, or end-stage condition?

A DNR order for such a patient that was valid prior to the effective date of the Health Care Decisions Act remains valid. Under prior law, a DNR order was valid for a patient who was not already in a terminal condition only if the order was entered at the instruction of a competent patient after informed consent, with the consent of a properly authorized health care agent, including an attorney-in-fact under a durable power of attorney for health care; or with the consent of the patient's family prior to October 1, 1993, in

accordance with the standards set out in 73 *Opinions of the Attorney General* 162, 196-99 (1988), and with a physician's certification that, in the event the patient suffered a cardiac arrest, the patient would then be in a terminal condition.  A DNR order entered since the effective date of the Act for such a patient is valid under the circumstances discussed in this opinion.

     7.    May related institutions that handle chronic care cases require consent to the withholding or withdrawing of life-sustaining procedures or the entry of a DNR order as a condition of admission to the facility?

     No, they may not.

# I

## Cardiopulmonary Resuscitation and DNR Orders

### A.    *Resuscitation Procedures*

"Cardiac arrest is the sudden unexpected cessation of heartbeat and blood pressure.  It leads to loss of consciousness within seconds, irreversible brain damage in as little as 3 minutes, and death within 4 to 15 minutes." Office of Technology Assessment, *Life-Sustaining Technologies and the Elderly* 168 (1985) (hereafter cited as *Life-Sustaining Technologies*).[2]

CPR is the label for a set of procedures intended to restore heart and lung functions to someone who has suffered a cardiac arrest.[3]  One medical dictionary defines CPR as "restoration of

---

[2] Respiratory arrest is a related but at times distinct medical emergency: "Respiratory arrest is the sudden cessation of effective breathing ....  Without effective breathing, the blood is unable to supply adequate oxygen to the heart and brain or eliminate carbon dioxide from body tissues.  Consequently, respiratory arrest will be followed within minutes by gradual loss of consciousness and then by cardiac arrest." *Id.*

[3] If it works, CPR literally brings someone back from death:

    "*Clinical death* is the term used to

(continued...)

cardiac output and pulmonary ventilation following cardiac arrest and apnea, using artificial respiration and closed chest massage." *Stedman's Medical Dictionary* 1349 (25th ed. 1990). "In describing the spectrum of procedures involved in resuscitation, it is helpful to divide the process into two stages: basic and advanced life support." *Life-Sustaining Technologies* at 169. Basic life support consists of techniques used by rescuers at the scene to open the airway and restore breathing and circulation; advanced cardiac life support "consists of basic life support and the techniques and machinery that sustain life after the immediate, manual steps are taken." *Id*. at 170.

This opinion deals primarily with decision-making concerning advanced cardiac life support.[4] Advanced cardiac life support involves intrusive and painful measures. The Court of Appeals, quoting from a Massachusetts decision, described some of these procedures as follows:

> "Such efforts typically involve the use of cardiac massage or chest compression and delivery of oxygen under compression through an endotracheal tube into the lungs. An

_____

[3] (...continued)
> encompass that short interval after the heart has finally stopped, during which there is no circulation, no breathing, and no evidence of brain function, but when rescue is still possible. If this stoppage occurs suddenly, as in cardiac arrest ..., a brief time remains before vital cells lose their viability, during which measures such as cardiopulmonary resuscitation ... may succeed in resuscitating a person whose life has seemingly ended – the time is probably no more than four minutes." Sherwin B. Nuland, *How We Die* 121 (1994).

[4] A pulmonary arrest caused, for example, by an airway obstruction, would always call for an immediate emergency response: "A cardiopulmonary arrest requiring [advanced cardiac life support] should be distinguished from a respiratory arrest resulting from upper airway obstruction (*e.g.*, aspiration of food) .... One assumes that patients who are choking would be treated, *i.e.*, receive certain components of basic CPR." Donald J. Murphy, *Do-Not-Resuscitate Orders: Time for Reappraisal in Long-term-Care Institutions*, 260 J.A.M.A. 2098 (1988).

electrocardiogram is connected to guide the efforts of the resuscitation team and to monitor the patient's progress. Various plastic tubes are usually inserted intravenously to supply medications or stimulants directly to the heart. Such medications may also be supplied by direct injection into the heart by means of a long needle. A defibrillator may be used, applying electric shock to the heart to reduce contractions. A pacemaker, in the form of an electrical conducting wire, may be fed through a large blood vessel directly to the heart's surface to stimulate the heart's contractions and to regulate beat. These procedures, to be effective, must be initiated with a minimum of delay as cerebral anoxia, due to a cut off of oxygen to the brain, will normally produce irreversible brain damage within three to five minutes and total brain death within 15 minutes. Many of these procedures are obviously highly intrusive, and some are violent in nature. The defibrillator, for example, causes violent (and painful) muscle contractions ...."

*In re Riddlemoser*, 317 Md. 496, 501 n.2, 564 A.2d 812 (1989) (quoting *Matter of Dinnerstein*, 380 N.E. 2d 134, 135-36 (Mass. App. 1978)).

Traditionally, policies at hospitals and nursing homes would require CPR to be initiated on any patient who suffered a cardiac arrest, unless a specific order not to attempt resuscitation − a DNR order, sometimes called a "no code" order − had been entered on the patient's chart.[5] "Implicit in the care of hospitalized patients is the understanding that, provided no orders exist to the contrary, they will be resuscitated ... in the event of a cardiopulmonary arrest." S.

---

[5] As defined at the Johns Hopkins Hospital, a DNR order "specifically instructs that no blow to the chest, compression of the chest, cardiac massage, defibrillation, administration of cardiotonic or vasoactive drugs, or any form of artificial ventilation be undertaken should cardiopulmonary arrest occur." S. Buchanan *et al., Implementation of DNR Orders in the Department of Medicine, The Johns Hopkins Hospital,* 37 Md. Med. J. 461, 461-62 (1988).

Buchanan et al., *Implementation of DNR Orders in the Department of Medicine, The Johns Hopkins Hospital*, 37 Md. Med. J. 461 (1988). This inversion of the usual principle that consent is required prior to the initiation of a form of treatment has been justified by the emergency nature of the problem and the assumption that most people would want efforts made to save their lives. *See* §5-607 of the Health-General ("HG") Article, Maryland Code (authorizing emergency life-sustaining treatment without consent). "This 'standing order' for CPR essentially establishes a presumption in favor of its administration without informed consent. This makes eminent good sense." Alan Meisel, *The Right to Die* §5.4, at 118 (1989) (hereafter cited as *The Right to Die*).

A number of recent studies have suggested, however, that CPR may not make good sense for all patients. A procedure that was originally developed for otherwise healthy trauma victims can have exceedingly low success rates among patients with very serious health problems. For example, a study of patients with multiple organ system failure showed that CPR did not help any of these patients survive an arrest. M.W. Peterson *et al.*, *Outcome after Cardiopulmonary Resuscitation in a Medical Intensive Care Unit*, 100 Chest 168 (1991). A recent article advocating more sparing use of CPR for some categories of patients cites a number of similar studies. Donald J. Murphy and Thomas E. Finucane, *New Do-Not-Resuscitate Policies: A First Step in Cost Control*, 153 Arch. Internal Med. 1641, 1642-43 (1993). These studies and related commentaries in the medical literature have produced a more discriminating approach to CPR in some facilities. As one group of physicians wrote a few years ago, "selection of candidates for this emotionally and physically injurious procedure must be made carefully. [CPR] is a traumatic, time-consuming, and expensive technology that should be reserved for those for whom there is a reasonable chance of survival to discharge." George E. Taffet *et al.*, *In-Hospital Cardiopulmonary Resuscitation*, 260 J.A.M.A. 2060, 2072 (1988).

## B.    CPR As A "Life-Sustaining Procedure"

Much of the balance of this opinion will discuss the authority of various decision-makers to approve a DNR order. The analysis of this issue, in turn, depends in part on whether CPR is a "life-sustaining procedure." As we have just explained, CPR is intended to save a patient whose life would end in a matter of minutes without intervention. So CPR surely is a "life-sustaining procedure" in the ordinary sense of the term. The definition of the term in the Health

Care Decisions Act poses an interpretive problem, however. As codified in HG §5-601(m), the definition is as follows:

> (1) "Life-sustaining procedure" means any medical procedure, treatment, or intervention that:
>
> (i) Utilizes mechanical or other artificial means to sustain, restore, or supplant a spontaneous vital function; *and*
>
> (ii) Is of such a nature as to afford a patient no reasonable expectation of recovery from a terminal condition, persistent vegetative state, or end-stage condition.
>
> (2) "Life-sustaining procedure" includes artificially administered hydration and nutrition, and cardio-pulmonary resuscitation.

(Emphasis added.)

As we discussed in a prior opinion, the Health Care Decisions Act was the product of compromise between different versions of comprehensive legislation. *See* 78 *Opinions of the Attorney General* 208, 209 n.2 (1993). One of the bills, House Bill 1243/Senate Bill 676, was introduced with the following broad definition of "life-sustaining procedures": "[a]ny medical procedure, treatment, or intervention used to sustain, restore, or supplant a spontaneous vital function to prevent or postpone the death of an individual." The other bill, House Bill 1432/Senate Bill 664, contained the following more detailed definition of "life-prolonging procedure":

> (1) "Life-prolonging procedure" means any medical procedure, treatment, or intervention that:
>
> (i) Utilizes mechanical or other artificial means to sustain, restore, or supplant, a spontaneous vital function; and

> (ii) Is of such a nature as to afford a patient no reasonable expectation of recovery from a terminal condition, persistent vegetative state, or inevitably fatal condition.[6]

> (2) "Life-prolonging procedure" includes artificially administered hydration and nutrition, and cardiopulmonary resuscitation.

This definition of "life-prolonging procedure" was adapted from the now-repealed Living Will Law. *See* former HG §5-601(e).

When the House Environmental Matters Committee decided to rework the legislation, it choose as its starting point the text of House Bill 1432. The Committee then made a great many changes to the text and ultimately adopted the reworked text of House Bill 1432 as an amendment to House Bill 1243, and it is the amended version of House Bill 1243 that ultimately was enacted into law. The term "life-sustaining procedure" was substituted for "life-prolonging procedure," but otherwise the definition from House Bill 1432 was retained.[7]

Given its use of the conjunction "and" between the two subparagraphs of HG §5-601(m)(1), the definition as enacted can be read so as to limit "life-sustaining procedures," including CPR, to only those that "afford a patient no reasonable expectation of recovery from a terminal condition, persistent vegetative state, or end-stage condition."[8] Suppose, for example, that a patient suffers

---

[6] The term "inevitably fatal condition" was later replaced with the term "end-stage condition."

[7] Simultaneously, the House Committee added provisions on guardianship that had been omitted from House Bill 1432. In the part of the Health Care Decisions Act governing guardianship, the term "life-sustaining procedure" is defined as it originally was when House Bill 1243 was introduced, not as it became after the definition from House Bill 1432 was incorporated. *See* §13-711(c) of the Estates and Trusts Article, Maryland Code.

[8] The ordinary meaning of the conjunction "and" is that it "connect[s] words or phrases expressing the idea that the latter is to be

(continued...)

from Alzheimer's Disease, is incapable of making her own medical decisions, but does not meet the criteria for "end-stage condition."[9] A surrogate for this patient may make health care decisions on her behalf generally but may not withhold or withdraw a "life-sustaining procedure." *See* Part II below.  Suppose further that the patient is healthy enough so that CPR stood a reasonable chance of succeeding if she had a cardiac arrest.  Then CPR would *not* be "of such a nature as to afford a patient no reasonable expectation of recovery from a terminal condition, persistent vegetative state, or end-stage condition."  The patient is in none of those conditions, and would not be even after cardiac arrest.  Hence, under a literal reading of the definition, CPR under these circumstances would not be a "life-sustaining procedure," the withholding or withdrawal of which is subject to special safeguards.  Rather, a decision about CPR would simply be a "decision about health care" and therefore within the surrogate's general authority.

We reject this construction of the definition, however.  "[T]he primary goal of [statutory construction] is determining the intent of the Legislature when it enacted the subject statute.  We begin our search for legislative intent with the words of the statute to be interpreted, ... considered in light of the context ...."  *GEICO v. Insurance Comm'r*, 332 Md. 124, 131, 630 A.2d 713 (1993).  As the Court of Appeals wrote in its most influential modern case on statutory construction, "The purpose, in short, determined in light of the statute's context, is the key."  *Kaczorowski v. City of Baltimore*, 309 Md. 505, 516, 525 A.2d 628 (1987). *See also, e.g., B. Frank Joy Co. v. Isaac*, 333 Md. 628, 631, 636 A.2d 1016 (1994).  In particular, the word "and" need not be given its conventional meaning if a different construction "is necessary to effectuate the

---

[8] (...continued)
added to or taken along with the first."  *Black's Law Dictionary* 86 (6th ed. 1990).  Maryland statutes are drafted with the ordinary meaning in mind.  Revisor of Statutes, *Maryland Style Manual for Statutory Law* 23 (1985) ("Use 'and' to connect requirements that are additive to each other.").  *See Comptroller v. Fairchild Ind., Inc.*, 303 Md. 280, 285-86, 493 A.2d 341 (1985).  Because CPR is merely "include[d]" in the term "life-sustaining procedure," one must analyze the definition itself to determine the scope of the term.

[9] For a discussion of those criteria, *see* 78 *Opinions of the Attorney General* 208, 211-14 (1993).

obvious intention of the legislature." *Comptroller v. Fairchild Ind., Inc.*, 303 Md. 280, 286, 493 A.2d 341 (1985).

One key purpose of the Act was to specify the three diagnostic categories within which a surrogate is empowered to forgo those procedures that might keep the patient alive. *See* HG §5-606(b) (terminal condition, end-stage condition, or persistent vegetative state). The legislative debate over whether to include "end-stage condition" within the grant of authority to surrogates would have been absurd if, because of the wording of the definition of "life-sustaining procedure," the surrogate had essentially limitless authority to forgo measures intended to prolong life.[10] Taking into account the full context, the definition cannot be construed to mean that when a procedure like CPR would probably work to save a patient's life and the patient is in relatively good physical health, the surrogate nonetheless has discretion to forgo the procedure.

In our view, the proper way to read the definition is that any procedure is a "life-sustaining procedure" if it fits the description in HG §5-601(m)(1)(i) – that is, if it is a procedure that uses "artificial means to sustain, restore, or supplant a spontaneous vital function." Subparagraph (ii) does not limit the generality of this key portion of the definition. Instead, it describes a subcategory of life-sustaining procedures for patients in one of the three designated conditions. As to these patients, a procedure that uses "artificial means to sustain, restore, or supplant a spontaneous vital function" is the kind of "life-sustaining procedure" that a surrogate may decline if it is of such a nature as to afford a patient who is in a terminal condition, persistent vegetative state, or end-stage condition no reasonable expectation for recovery from that condition. *See* Part II below.

## C.   *Code Status Decision-Making*

As discussed in Part IA above, a typical institutional policy would require that CPR be attempted on any patient who is

---

[10] Such a construction would also unduly truncate the duty of health care providers to protect their patients against improper decisions "to withhold or withdraw a life-sustaining procedure" from an incapacitated patient. HG §5-612(a). *See also* note 20 below. Health care providers would be expected to be especially attentive to decisions to forgo life support measures when the patient is in none of the three diagnostic categories.

discovered to have suffered a cardiac arrest, unless a DNR order has been entered on the patient's chart. Thus, for each patient, a decision is made: for most patients, implicitly, that CPR will be performed, in accordance with the standing order embodied in the institution's policy; and for some patients, explicitly, that CPR will not be performed, in accordance with the DNR order entered in the individual case.

As a general matter, each patient whose condition predisposes the patient to a significant risk of cardiac arrest is entitled to have a timely and considered decision made about what the patient's code status should be. When a patient suffers a cardiac arrest, or course, there is no time for a health care provider to obtain consent for the treatment. In our view, however, the statute that authorizes the administration of CPR without consent should be construed to require an effort to obtain instructions, in advance, when the emergency event is one for which contingency plans should be made.

The use of CPR falls within HG §5-607, which authorizes health care providers to perform emergency medical treatment without consent in order to avert a "substantial risk of death or immediate and serious harm to the patient ...." This statutory authority to treat without consent in an emergency may be invoked only if "[a] person who is authorized to give the consent is not available immediately."[11] In the typical emergency — when someone

---

[11] The full text of HG §5-607 is as follows:

> A health care provider may treat a patient who is incapable of making an informed decision, without consent, if:
>
> (1) The treatment is of an emergency medical nature;
>
> (2) A person who is authorized to give the consent is not available immediately;
>
> (3) The attending physician determines that:

(continued...)

unexpectedly has a heart attack, for example − decisions about treatment are made simultaneously with the emergency, and the health care provider has no time to look for someone to consent.

Decision-making about CPR for a patient in a hospital, long-term care facility, hospice, or home health program is markedly different. A decision about such a patient's code status is a form of advance planning about a possible emergency, and often a person authorized to consent to the treatment would be "available immediately" at the time that this advance planning decision is made. A facility should not simply assume that it has authority under HG §5-607 to perform emergency treatment without consent if consent could feasibly have been solicited before the emergency arises and, given the circumstances of the patient's condition, a decision to decline CPR is a realistic possibility. *Cf.* Restatement (Second) of Torts §892D cmt. a (1979) (common law emergency doctrine does not authorize action if actor knows that consent would not be given, because of past refusal of consent or other circumstances).

If, under a facility's policy, a patient would be given CPR in the absence of a DNR order, but the patient's condition is such that a decision against the use of CPR would not be unreasonable, the patient (if competent) or an incapacitated patient's authorized decision-maker should be asked to consent to the proposed emergency treatment.[12] "The discussion about CPR, as about any other treatment, should be aimed at assuring that the competent patient or the surrogate understands what CPR is, the conditions under which it is used, its risks and benefits, and the consequences of not administering it when an arrest occurs." *The Right to Die*

---

[11] (...continued)

 (i) There is a substantial risk of death or immediate and serious harm to the patient; and

 (ii) With[in] a reasonable degree of medical certainty, the life or health of the patient would be affected adversely by delaying treatment to obtain consent.

[12] By "authorized decision-maker," we mean a guardian of the person of the patient; a health care agent under an advance directive; or a surrogate authorized to act under HG §5-605.

§5.4, at 119. Likewise, if the patient's attending physician proposes to enter a DNR order on any basis other than the medical ineffectiveness of CPR, the patient (if competent) or an incapacitated patient's authorized decision-maker should be asked to consent to the DNR order. "Decisionmaking about the entry of a DNR order should begin on the same basis as decisionmaking about any other form of treatment. Physicians should ordinarily initiate discussion with patients, eliciting their wishes about treatments that their medical conditions might necessitate." *Id*. [13]

## II

## Surrogate Consent to a DNR Order

A surrogate is generally authorized to "make decisions about health care for a person who has been certified to be incapable of making an informed decision and who has not appointed a health care agent ...." HG §5-605(a)(2). The statute places conditions on this otherwise broad grant of authority when it comes to a decision to withhold or withdraw "life-sustaining procedures," however. *See* Part IB above. A health care provider may not carry out that decision unless the patient's attending physician and a second physician have certified that the patient is in a terminal condition or a persistent vegetative state or has an end-stage condition. HG §5-606(b).[14]

The studies alluded to in Part IA above identified types of patients for whom an arrest signaled the start of an inevitable dying process, whether or not CPR was successful. Even if CPR restored cardiopulmonary function, the studies indicated that all of the patients with certain defining diagnostic criteria died within a matter of days, or at most a few weeks. In other words, these patients are

---

[13] If the attending physician has concluded that CPR would be "medically ineffective," the physician may enter a DNR order without consent. *See* Part IVA below. Under these circumstances, however, the attending physician must "infor[m] the patient or the patient's agent or surrogate of the physician's decision." HG §5-611(b)(2)(i).

[14] A patient may not be certified to be in a persistent vegetative state unless one of the two certifying physicians is "a neurologist, neurosurgeon, or other physician who has special expertise in the evaluation of cognitive function ...." HG §5-606(b)(2).

in a "terminal condition" once they suffer an arrest, even if their condition was not terminal prior to the arrest. For these patients, CPR would merely prolong an irreversible dying process that begins at the point of the arrest and that ends imminently in death.

Under these circumstances, a surrogate is legally authorized to consent to a DNR order, if doing so would accord with "the wishes of the patient and, if the wishes of the patient are unknown or unclear, [with] the patient's best interest." HG §5-605(c)(1). *See also* HG §§5-605(c)(2) (factors in assessing patient's wishes) and 5-601(e) (definition of "best interest"). Even if the patient is not in a terminal or end-stage condition or persistent vegetative state at the time of the surrogate's decision, the decision takes effect only when the patient is in a terminal condition − at the moment of arrest. The legally significant time for ascertaining the condition of the patient is the time when a health care provider would "withhold or withdraw life-sustaining procedures on the basis of ... the authorization of a surrogate ...." HG §5-606(b). At that time, the patient must be in a terminal or end-stage condition or persistent vegetative state, or else life-sustaining procedures may not be withheld or withdrawn. *Id.*

To summarize, a surrogate may authorize a DNR order for a patient who is not already certified to be in a terminal or end-stage condition or persistent vegetative state if the patient's attending physician (with the concurrence of another) certifies that, within a reasonable degree of medical certainty, if the patient suffers a cardiac arrest, the patient will be in a terminal or end-stage condition even if CPR would prevent death from the initial cardiac arrest. If, however, two physicians are not able to make that predictive medical judgment, then the surrogate is not authorized to consent to a DNR order unless the patient is already in one of the three conditions specified in HG §5-606(b). Nothing in the Health Care Decisions Act or this opinion, in short, authorizes the wholesale entry of DNR orders on patients in a facility without regard to their condition.


### III

### Guardian Consent to a DNR Order

In general, "where a medical procedure involves, or would involve, a substantial risk to the life of a disabled person, the court must authorize a guardian's consent or approval for" the initiation,

withholding, or withdrawing of the medical procedure. §13-708(c)(1) of the Estates and Trusts Article, Maryland Code ("ET" Article). Thus, a guardian is required to seek court authorization if the guardian is asked to consent or approve a physician's proposed entry of a DNR order on the chart of a ward.[15] A DNR order reflects a decision to withhold a medical procedure, CPR, that is ordinarily performed in an effort to save a patient's life. It is a "life-sustaining procedure," as defined in ET §13-711(c). *See* Part IB above.

The only circumstance under which a guardian would have independent authority to consent to a DNR order is if the court had previously authorized the guardian "to make a decision regarding medical procedures that involve a substantial risk to life without further court authorization ...." ET §13-708(c)(2). Such advance authorization may be given by the court under the criteria set out in ET §13-708(c)(2)(i) and (ii). *See* 78 *Opinions of the Attorney General* at 221-23. A guardian so authorized may forgo life-sustaining procedures, including CPR, under the same circumstances as any other surrogate. *See* Part II above.

## IV

## Physician Entry of a DNR Order

### A.  *Medically Ineffective CPR*

The Health Care Decisions Act contains a provision recognizing the authority of a physician to decline to provide "medically ineffective treatment": "Except as provided in §5-613(a)(3) of this subtitle, nothing in the subtitle may be construed to require a physician to prescribe or render medically ineffective treatment." HG §5-611(b)(1).[16] The term "medically ineffective treatment" is defined in HG §5-601(n) as follows:

---

[15] We are not here discussing a DNR order entered by a physician independently of the guardian. *See* Part IVB below.

[16] The exception refers to the right of a patient, under some circumstances, to obtain life-sustaining procedures pending transfer to a new health care provider. *See* HG §5-613(a)(3).

> "Medically ineffective treatment" means
> that, to a reasonable degree of medical
> certainty, a medical procedure will not:
>
>     (1) Prevent or reduce the deterioration of
> the health of an individual; or
>
>     (2) Prevent the impending death of an
> individual.

A treatment is "medically ineffective" only if it will have *neither* of the effects stated in the definition; conversely, if a medical procedure foreseeably would have either of the effects stated in the definition, the procedure is not "medically ineffective." In other words, if a patient is facing impending death and a treatment foreseeably would prevent the patient's impending death, the treatment is not medically ineffective as a matter of law. Under these circumstances, it does not matter that the treatment will not "prevent or reduce the deterioration of the health of the patient."

Suppose, for example, that a patient in a persistent vegetative state suffered a cardiac arrest. If CPR were successfully applied, it would have no effect whatever on the patient's persistent vegetative state. But (depending on the medical facts of the situation) it might well prevent the patient's impending death from lack of oxygen. Therefore, CPR would not be "medically ineffective," within the meaning of the Health Care Decisions Act.

It may be, of course, that the entry of a DNR order for a patient in a persistent vegetative state could properly be approved by a health care agent or surrogate, applying the decisional standards in HG §5-605(c). But that would be a decision for the agent or surrogate, not for the physician on grounds of medical ineffectiveness. The carefully circumscribed definition of "medically ineffective treatment" is meant to prevent an unwarranted transfer of decision-making authority to physicians.

The limited definition is also intended to ensure that futility judgments are made on strictly medical grounds. In particular, Maryland law does not authorize a physician to enter a DNR order for reasons of cost control. Forceful arguments can be advanced, we recognize, for the proposition that "[t]o control the cost of health care and to improve access to care for the uninsured, our society will have to set limits on health care," and "new do-not-resuscitate

(DNR) policies would be just and relatively painless ways to set these limits." Donald J. Murphy and Thomas E. Finucane, *New Do-Not-Resuscitate Policies: A First Step in Cost Control*, 153 Arch. Internal Med. 1641 (1993). But the General Assembly has not come to that rationing decision, and physicians may not impose it unilaterally on their patients. A treatment is not "medically ineffective" merely because, applying a social utilitarian calculus, two doctors decide that the resources committed to the treatment of a very ill patient might better be allocated elsewhere in the health care system.[17] *See* Preamble to Chapter 372 (House Bill 1243), Laws of Maryland 1993.

Within the confines of the statutory definition, however, physicians are free to make their professional judgments about the efficacy of various procedures. As discussed in Part IA above, cardiac arrest in some patients represents the start of an inexorable dying process that cannot be prevented by CPR. Under such circumstances, a physician might well be justified in concluding that CPR would be "medically ineffective," under the definition in HG §5-601(n), because CPR would neither ameliorate the underlying condition nor "prevent [the patient's] impending death."[18].

---

[17] Drs. Murphy and Finucane do not intimate otherwise. Their proposal for rationing CPR is explicitly intended to "presen[t] a change that can be critiqued by the public," and they suggest a public process for developing hospital DNR policies. 153 *Arch. Internal Med.* at 1644 and 1646-47. The ethical dilemma facing physicians caught in a "conflict between traditional obligations to serve the patient and claimed duties to serve the broader society by conserving the health care dollar ..." is discussed in Susan M. Wolf, *Health Care Reform and the Future of Physician Ethics*, Hastings Center Rep. March-April 1994, at 28.

[18] When House Bill 1243 was introduced, the pertinent portion of the definition of "medically ineffective" treatment was that it would not "prevent or postpone for more than an insignificant length of time the death of an individual." As enacted, the definition omits reference to the "postpone[ment]" of death and speaks of a "medically ineffective treatment" simply as one that will not "prevent the impending death of an individual." "Prevent" means to "stop or intercept the approach ... of a thing." *Black's Law Dictionary* 1188 (6th ed. 1990). "Postpone," by contrast, means to "put off; defer; delay ...." *Black's Law Dictionary* 1168. The General Assembly evidently decided to allow physicians to certify as "medically ineffective" interventions like CPR that might interrupt and

(continued...)

Given that CPR is generally "life-sustaining in nature," at least when viewed across the patient population as a whole, the attending physician of a patient may withhold CPR as medically ineffective "only if the patient's attending physician and a second physician certify in writing that the treatment is medically ineffective and the attending physician informs the patient or the patient's agent or surrogate of the physician's decision." HG §5-611(b)(2)(i). If the patient were under guardianship, the attending physician must inform the patient's guardian, because the guardian is also a surrogate. *See* HG §5-605(a)(2)(i).

## B.    *Patients Under Guardianship*

Under the procedure delineated in the Act, the guardian would *not* be asked by the attending physician to give "consent or approval for" a physician's decision to withhold CPR on grounds of medical ineffectiveness. That decision has been made by the attending physician with the concurrence of another physician, and the physician would enter the DNR order on his or her own authority, as recognized by HG §5-611(b). The physician would merely be informing the guardian of the physician's own decision. In other words, the prerequisite for advance court authorization under ET §13-708(c)(1) will not be present: Since the guardian's "consent or approval for" the DNR order is not required, neither is court authorization.

At the same time, the guardian should consider the court's potential reaction to the attending physician's DNR order. As the Court of Appeals reiterated last year, the guardian is merely the agent of the court, which is itself ultimately responsible for the welfare of the ward. *Mack v. Mack*, 329 Md. 188, 201, 618 A.2d 744 (1993). *See also Kircherer v. Kircherer,* 285 Md. 114, 118-19, 400 A.2d 1097 (1970).

In our view, if a guardian is informed by the attending physician of the physician's determination that CPR or any other life-sustaining treatment would be medically ineffective in the case of the ward, the guardian should ordinarily inform the court promptly of the attending physician's determination and provide a copy of the written certification and the physician's order to

---

[18] (...continued)
delay, but would not really alter, the dying process.

implement it. The guardian would not be seeking the court's authorization pursuant to ET §13-708(c)(1), for, as we have explained, that provision is inapposite under the circumstances. The DNR order would be effective immediately. The guardian would be reporting, however, an event of potentially great significance to the welfare of the ward. The court would then have the opportunity to review the situation and decide on an appropriate course of action, including, potentially, instructing the guardian to invoke the transfer process in HG §5-613 if the court concludes that CPR should be performed but the physician adheres to the view that it would be medically ineffective.[19]

## V

## Health Care Agent Consent To A DNR Order

A competent individual may appoint a health care agent in a written or oral advance directive. HG §5-602(b)(1) and (d). The individual making the appointment defines the circumstances under which the health care agent may make decisions for the individual. HG §5-602(b)(1). For example, the optional form set out in the Health Care Decisions Act grants to the agent "full power and authority to make health care decisions for me, including the power to ... [c]onsent to the provision, withholding or withdrawal of health care, including, in appropriate circumstances, life-sustaining procedures." *See* HG §5-603, Form IIA, ¶(2)(d).

Nothing in the Act itself limits to specified conditions the decisional authority of a health care agent over life-sustaining procedures. HG §5-606(b), which instructs a health care provider not to withhold or withdraw life-sustaining procedures on the basis of an advance directive unless the patient has been certified to be in a terminal condition, end-stage condition, or persistent vegetative state, applies only "where no agent has been appointed ...."

---

[19] HG §5-613(a) requires a health care provider "that intends not to comply with an instruction or a surrogate" to "make every reasonable effort to transfer the patient to another health care provider ...."

The Legislature's decision not to confine a health care agent's authority by statute was not inadvertent. It reflected a judgment that, if a competent individual chooses someone to make health care decisions for the individual and also chooses to give the agent broad authority, the State through its law should not interfere with that act of private decision-making.

Hence, if a health care agent's authority to make decisions about life-sustaining procedures is not limited to particular conditions by the advance directive containing the appointment, the health care agent may consent to the entry of a DNR order without a certification about the patient's condition.[20]

## VI

## DNR Orders Entered Prior to the Health Care Decisions Act

### A.    Patient Consent

The 1988 Attorney General's opinion concluded that the constitutional and common law "right of self-determination about medical treatment means that a competent person may engage in direct decisionmaking when the person and the physician are discussing a future course of treatment. That discussion might well deal with questions of the person's consent to treatment if various contingencies were to arise." 73 Opinions of the Attorney General at 185. It is possible that some of these "informed consent" discussions included a decision about a DNR order if cardiac arrest were one of "contingencies" considered.

The Health Care Decisions Act is "cumulative with existing law regarding an individual's right to consent or refuse to consent to medical treatment and do[es] not impair any existing rights or responsibilities which ... a patient ... or a patient's family may have

---

[20] Under the Act, health care providers have a duty to protect patients against a decision by a health care agent or any other decision-maker to forgo life-sustaining procedures if the decision "is inconsistent with generally accepted standards of patient care ...." HG §5-612(a). Under such circumstances, the health care provider must bring the matter to the attention of an institution's patient care advisory committee or a court.

in regard to the provision, withholding, or withdrawal of life-sustaining procedures under the common law or statute of the State." HG §5-616(a). Thus, a DNR order entered as a result of such a discussion between patient and physician remains valid, so long as the circumstances that led to the patient's decision are not significantly changed.[21]

### B.   *Attorney-in-Fact Consent*

The 1988 Attorney General's opinion concluded that competent individuals had the authority to use the Maryland durable power of attorney statute, ET §13-601, to create durable powers of attorney for health care. 73 *Opinions of the Attorney General* at 183-84. Under these instruments, an attorney-in-fact could be given broad authority to make decisions on behalf of the principal.

Under the Health Care Decisions Act, a durable power of attorney for health care is a type of advance directive appointing an agent. *See* HG §5-602(b)(1); ET §13-601(d). The Act expressly gives "full force and effect" to "any designation of an agent made prior to October 1, 1993 ...," HG §5-614(d), and further provides that "[a] valid ... durable power of attorney for health care made prior to October 1, 1993 shall be given effect as provided in this article, even if not executed in accordance with the terms of this article." HG §5-616(b).

An attorney-in-fact under a broadly drafted durable power of attorney for health care was authorized to consent to entry of a DNR order. Under the Act, such a DNR order remains valid.

### C.   *Family Consent*

Prior to the effective date of the Health Care Decisions Act, family members had statutory authority only to *consent* to life-sustaining treatment on behalf of an incapacitated patient. *See* former HG §20-107(h) (1990 Repl. Vol.); 73 *Opinions of the Attorney General* 162, 192-95 (1988). As a matter of common law,

---

[21] For a discussion of the status of DNR orders resulting from such physician-patient discussions after October 1, 1993, the effective date of the Health Care Decisions Act, *see* Part VII below.

however, family members had a limited right to consent to the withholding or withdrawing of life-sustaining treatment for a patient in a terminal condition. *See* 73 *Opinions of the Attorney General* at 196-99.

This common law right of family members extended to DNR orders under the circumstances identified in the 1988 Attorney General's opinion, and it further permitted family consent to a DNR order for a patient who was not in a terminal condition at the time of entry of a DNR order but who would be at the time of a cardiac arrest. *See* Part II above. *See also* letter of advice from Jack Schwartz, Chief Counsel for Opinions and Advice, to Gene Heisler, Deputy Director of Licensing and Certification Programs (September 16, 1992). Applying HG §5-616(a), we conclude that family consents to DNR orders made under the common law, as discussed in the 1988 Attorney General's opinion, remain valid.[22]

## VII

### DNR Decisions in Advance Directives and Informed Consent Discussions

Anyone who has authority to make decisions on behalf of an incapacitated patient — whether a health care agent, surrogate, or guardian — is obliged to base his or her decision on the wishes of the patient, if known. HG §§5-603 and 5-605 and ET §13-711. An advance directive is determinative evidence of those wishes as to any decision encompassed by the directive.

An advance directive might well contain a decision directly applicable to CPR. If a declarant states a refusal of life-sustaining treatment in the event of terminal condition, for example, then the advance directive would be directly applicable to CPR, a life-sustaining treatment. An advance directive containing such an instruction should be implemented by entry of a DNR order if the

---

[22] "Family consents to DNR orders" after October 1, 1993, are governed by the "surrogate decision making" aspect of the Health Care Decisions Act. *See* Part II above.

patient is certified to be in the condition discussed in the advance directive.[23]

A more difficult issue is the effect to be accorded a formerly competent patient's decision to decline CPR if the patient made the decision in a discussion with a physician that was unwitnessed and therefore is *not* an oral advance directive under the Act. *See* HG §§5-601(b)(2) and 5-602(d). Undoubtedly a health care agent or surrogate may view this decision as the best available evidence of what the patient would have wanted, and act accordingly. But what if there is no agent or surrogate? May the decision be carried out directly, or must a guardianship be established?

On the one hand, we would not be faithful to the General Assembly's purpose if we accorded the same legal effect to an unwitnessed statement as to an oral advance directive. To do so would make a nullity out of the witness requirement, which the General Assembly included as a measure of protection for the patient. On the other hand, the Act surely has not displaced entirely the legal right of patients simply to tell their physicians what they want and don't want, with informed consent. The Act's "cumulative rights" provision, HG §5-616(a), must be given effect too.

At least until authoritative guidance is available from the courts, we suggest the following approach: A competent patient's decision to forgo CPR may be given direct effect by entry of a DNR order, even if the patient is no longer competent and no health care or surrogate is available, under the same circumstances as discussed in the 1988 Attorney General's opinion − if the patient's decision, albeit not an oral advance directive, is the product of informed consent about contingencies in the discrete context of a discussion of "a future course of treatment." 73 *Opinions of the Attorney General* at 185.[24] But if the patient merely tells the physician of a generalized and open-ended desire to forgo life-sustaining

---

[23] This opinion does not address issues concerning DNR orders and surgery − specifically, the suspension of a DNR order during anesthesia and surgery. This difficult issue is analyzed thoroughly in *The Right to Die* §5.4, at 92-96 (1993 Cum. Supp.).

[24] In giving direct effect to a competent patient's decision under these circumstances, a health care provider need not obtain a certification of the patient's condition, for HG §5-606(b) does not apply.

procedures, including CPR, in the indefinite future, the decision may be given effect only as evidence that might allow some other decision-maker – a health care agent, surrogate, or guardian with court approval – to authorize a DNR order. Physicians need to be aware of the importance of having a witness to this more generalized type of patient decision in order to create a fully effective oral advance directive.[25]

# VIII

## Mandating Consent to a DNR Order

HG §5-614(c) prohibits a health care provider from conditioning health care on execution of an advance directive: "A person may not be required to make an advance directive as a condition for being insured for, or receiving, health care services." Thus, a long-term care facility may not require a prospective resident, or a health care agent or surrogate, to execute an advance directive declining CPR or any other form of life-sustaining treatment.

Moreover, the Nursing Home Patient's Bill of Rights ensures residents the right to receive appropriate treatment, HG §19-343(b)(2)(ii), and the right to "participate in the planning of the medical treatment," HG §19-344(b)(1)(i). Even if the resident initially agreed to a DNR order, the resident is free to change his or her mind. *See also* HG §5-604 (revocation of advance directive).

# IX

## Conclusion

The Health Care Decisions Act is a significant reform of Maryland law, of great potential benefit to patients, their families, and health care providers. As with other significant reforms,

---

[25] Because an unwitnessed discussion between patient and physician would not be an oral advance directive, within the meaning of HG §§5-601(b)(2) and 5-602(d), a health care provider who acted on the decision would not have the immunity from liability granted under HG §5-609(a).

however, some aspects of this law require interpretation to achieve the intended benefit.  We hope that this opinion provides a useful clarification.


J. Joseph Curran, Jr.
*Attorney General*

Jack Schwartz
*Chief Counsel*
 *Opinions & Advice*